IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

---

KAMRAN SAHAMI and KRISTIN WATSON,

Plaintiffs,

v.

METROPOLITAN STATE UNIVERSITY OF DENVER

Defendant.

---

COMPLAINT AND JURY DEMAND

---

COME NOW the Plaintiffs, Kristin Watson ("Watson) and Kamran Sahami ("Sahami") (collectively, "Plaintiffs"), by and through their undersigned counsel, McNamara &Shechter LLP, and for their Complaint against the above-named Defendant, allege as follows:

JURISDICTION AND VENUE

1. The subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000(e)*et seq*.

2. Defendant Metropolitan State University of Denver ("Defendant" or "MSU") is an agency of the State of Colorado, and, *inter alia*, provides higher educational services to Colorado students. Defendant's principal campus is located in Denver, Colorado. The Court has personal jurisdiction over Defendant.

3. The acts complained of herein were committed or had their principal effect within the District of Colorado and, therefore, venue is proper within this district pursuant to 28 U.S.C. § 1391.

PARTIES

4. Plaintiff Watson is a citizen of the United States and a resident of and domiciled in the State of Colorado. At all times relevant to the allegations in this Complaint, Plaintiff was employed by Defendant within the State of Colorado, and was, at that time, a resident of and domiciled in the State of Colorado.

5. Plaintiff Sahami is a citizen of the United States and a resident of and domiciled in the State of Colorado. At all times relevant to the allegations in this Complaint, Plaintiff was employed by Defendant within the State of Colorado, and was, at that time, a resident of and domiciled in the State of Colorado.

6. Defendant is an employer within the meaning of that term set forth in applicable Federal law and was, at all times relevant to the allegations in this Complaint, Plaintiffs' employer as defined by applicable law. Defendant is an arm of the State of Colorado operating as a University.

ADMINISTRATIVE PREREQUISITES

7. Plaintiff Watson timely filed with the United States Equal Employment Opportunity Commission ("EEOC") a Charge of Discrimination, Charge No. 32A-2015-00246, alleging sex discrimination, sexual harassment/sexually hostile work environment and retaliation with respect to her termination. The United States Department of Justice issued a Notice of Right to Sue with respect to Plaintiff's Charge on December 5, 2016. Plaintiff

received the Notice of Right to Sue on December 9, 2016. Plaintiff Watson's Complaint is timely filed in accordance with the Notice.

8. After a lengthy investigation, the EEOC determined there was reasonable cause to believe that MSU had subjected Watson to sexual harassment and a sexually hostile work environment, and subjected Watson to unlawful retaliation for having engaged in an activity protected by Title VII, including with respect to her termination.

9. Plaintiff Sahami timely filed with the EEOC a Charge of Discrimination, Charge No. 541-2015-00974, alleging retaliation with respect to disciplinary proceedings and actions taken against him by Defendant. The United States Department of Justice issued a Notice of Right to Sue with respect to Plaintiff's Charge on December 5, 2016. Plaintiff received the Notice of Right to Sue on December 9, 2016. Plaintiff Sahami's Complaint is timely filed in accordance with the Notice.

10. After a lengthy investigation, the EEOC determined there was reasonable cause to believe that MSU had subjected Sahami to unlawful retaliation for having engaged in an activity protected by Title VII.

## FACTUAL ALLEGATIONS

### *Background*

11. Plaintiffs repeat and re-alleges all previous paragraphs of their Complaint as though fully incorporated herein.

12. Plaintiff Watson is a female, and thus a member of a protected class under Title VII.

13. Plaintiff Watson is a former non-tenure track faculty member at MSU.

14. Prior to being recruited by MSU for a full-time position in 2009, Watson had over twenty years' experience as a marketing, public relations, and communications executive.

15. Watson hold a Masters Degree in Public Relations with an emphasis in the marketing field.

16. Watson was first hired by MSU in 2005 to serve as a Visiting Professor of Public Relations in the School of Communication.

17. In early 2009, Watson was recruited by the then-chair of the Marketing Department of MSU's School of Business (the "School") to join the marketing faculty as a Lecturer.

18. Throughout her career, Watson had regularly been commended for her performance at MSU. Indeed, her written performance evaluations had always been positive and reflected strong performance up until the time Gregory Black ("Black") was appointed as Chair of the Marketing Department.

19. While working at MSU, Watson established and led two different student organizations related to marketing. Watson was appointed Faculty Advisor to oversee internships for marketing and public relations students for approximately six years at MSU. Watson also developed the curriculum for several new courses at MSU.

20. Dr. Kamran Sahami is a tenured Professor of Physics at MSU. Sahami received his Ph.D. in Astrophysical, Planetary and Atmospheric Sciences from the University of Colorado in 2001. Sahami also holds two Master of Science degrees in Astrophysics and Applied Physics.

21. Dr. Sahami joined the faculty of MSU Denver in 2004 after 3 years as a research scientist at CU Boulder. In 2005, Sahami received a three-year, half-million-dollar National

Science Foundation (NSF) grant, along with the Denver Museum of Nature and Science, to explore Astronomy Education in Virtual Immersive Environments.

22. In 2006 Dr. Sahami was awarded the Faculty Senate Excellence in Teaching Award recognizing him as the outstanding tenure-track Professor of the 2006-2007 academic year and was chosen as a grant reviewer to the NSF REESE Directorate.

23. In 2007 Sahami was the first physics professor in MSU history to be awarded early tenure and was elected as the department of Physics representative to the Faculty Senate. Additionally, in 2007 Dr. Sahami was appointed the Interim Director of the Office of Sponsored Research and Programs at MSU

24. In early 2010, Dr. Sahami was elected President of the MSU Denver Faculty Senate and was re-elected for 3 subsequent terms until he stepped down in 2014. In 2011, Sahami was appointed by MSU President Steven Jordan ("Jordan") to serve as the Co-Chair of the Campus-wide Strategic Planning Committee, assessing the previous 5-year plan and producing the 2012-2017 MSU Comprehensive Strategic Plan.

*Dr. Black's Misconduct*

25. In the Spring of 2011, while serving as a non-tenured lecturer in the Marketing Department, Watson observed Marketing Department Chair Gregory Black masturbating in his office.

26. At the time, Watson was non-tenure track and on annually renewable employment contracts. Watson was completely shocked and emotionally traumatized by Black's behavior, and thus was afraid to report the incident initially, and feared potential retaliation by Black. Ultimately, in 2014, Watson did report the matter to Percy Morehouse ("Morehouse"), who was responsible for the School's Title IX and equal employment opportunity compliance.

27. Unbeknownst to her, Watson was not the only member of the MSU community to have witnessed Black's sexual misconduct. Another university professor, also witnessed Black engaged in a similar act in his office more than once. This professor also reported the incident to Dean Ann Murphy and Morehouse.

28. In early 2014, while serving as President of the Faculty Senate, Sahami received an anonymous phone call from the site of an-off campus employer. The caller, who purported to be an MSU student, indicated she had witnessed Black masturbating in the Marketing Department. Sahami indicated that as President of the Faculty Senate, this fell outside of his purview and encouraged the student to report the matter directly to Morehouse or Business School Dean Ann Murphy ("Murphy"). During the call, the student indicated that she feared retaliation because she had heard about a marketing department professor who had previously been fired for complaining about Black.

29. While he felt investigating the student's complaint was outside his purview and reported the complaint shortly thereafter to MSU President Steven Jordan, as President of the Faculty Senate, Sahami believed he had an obligation to determine whether the allegation concerning an allegedly terminated faculty member had some merit. Shortly after receiving the anonymous call, Sahami, who had no prior knowledge of the prior complaint, nor any relationship with the former faculty member, nonetheless deduced from information he was privy to about marketing department faculty changes, who the individual was who had been terminated.

30. Sahami called her and spoke with her briefly about her circumstances and the student complaint.

*Black and MSU Engage in a Pattern of Retaliation and Create a Sexually Hostile Work Environment for Watson*

31. Following each of these incidents, MSU, directly through Black or at his behest, retaliated against each of these three individuals who had observed or reported Black's misconduct.

32. In violation of its own internal policies, as well as widely accepted EEO best practices, in each instance someone complained about Black's conduct, Morehouse and MSU's EEO Office disclosed to Black the identity of the complaining/reporting witness. It was MSU's shocking lack of systemic EEO protections that led directly to Black's retaliatory activities.

33. Shortly after reporting to MSU that she had witnessed Black engaged in sexual misconduct, at Black's direction, MSU terminated a female professor's employment. She filed a Charge of Discrimination against MSU with the EEOC alleging discrimination and retaliation with respect to Black and her discharge.

34. In 2013, around the time of the fired female professor's initial EEOC complaint, which Watson was unaware of at the time, Watson applied for promotion to Senior Lecturer, as well as a three-year employment contract. At Black's behest, the School removed Watson from the list of senior lecturer candidates. Black did not request Watson's similarly situated Watson's similarly situated male colleagues be removed from the list of senior lecturer candidates.

35. Later that year, contrary to university-wide written guidelines, Black implemented new student evaluation score standards and, using those unauthorized and inappropriate

standards, found Watson's performance to be deficient. Upon information and belief, Black did not subject Watson's similarly situated male colleagues to these new standards

36. Black then informed Watson that he intended to begin a search for a candidate to replace her at MSU. At the time, Watson was a member of the marketing department search committee to locate candidates. Black summarily removed Watson from the search committee, replacing her with himself.

37. As a result, Watson felt she had no choice but to approach Morehouse and indicated that she felt Black's actions were as a result of her having observed him masturbating in his office. Following Watson's complaints to Morehouse, Black was forced to retreat to University-approved guidelines and could not replace Watson.

38. At the same time, and through the subsequent years, Black repeatedly interfered with Watson's ability to teach marketing courses. This ongoing interference was regular, and greatly interfered with Watson's ability to perform the essential functions of her position. Moreover, Black's actions significantly prejudiced Watson from advancement at MSU. Although Black's purported rationale was Watson's lack of a marketing degree, Watson had more course-work in marketing than her male, non-complaining colleagues, who also did not hold marketing degrees.

39. At the outset, of the 2013-2014 school year, Dr. Black announced that all non-tenure track faculty, including Watson, and two new emergency hires, would need to re-apply for their positions. Watson later learned that Black had initially sought permission to search for just two of the four non-tenure track positions, including hers. However, Dean Ann Murphy required Black to conduct a search for all four positions. Initially 4 positions were

announced and supposedly searched for, however only 2 different position descriptions were written.

40. At the outset of the year, a female faculty member applied to Chair the search committee. However, Black, who remained on the search committee himself, chose a younger, male to Chair the committee.

41. In February of 2014, Black first posted the four positions. Black, who drafted the descriptions in consultation with Murphy, worded all four positions to require "a MBA" and excluded language included on all previous job postings, and required by MSU policy: "or related fields". As an individual who has a degree in a "related field", Watson was not qualified to apply for either position.

42. After complaining to Dr. Morehouse of this discriminatory posting, Watson was informed by Dr. Morehouse the postings would be changed. However, again contrary to University policy on degrees, only two of the four positions were changed to "or related degrees". Watson applied for both openings, effectively applying for all four positions.

43. Dr. Black was still serving on the search committee at this time. Only after complaining a second time to Morehouse was Black actually removed from the search committee.

44. On April 26, 2014, Watson filed a formal internal complaint of discrimination with MSU against Dr. Black.

45. Although there were four candidates being "hired", or more accurately, retained, at Black's insistence, Murphy approved dividing the four spots into two pools. Dr. Black and Dean Murphy, and not the selection committee, determined who would be assigned to and

considered in each pool. Murphy and Black jointly decided Watson would only be considered for two of the four positions.

46. In the other positions, for which Watson was not considered, Murphy and Black considered only two candidates. These candidates were, of all the candidates considered for all four positions, by far the least qualified candidates. One of these employees was an "emergency hire" Black had made just months earlier. Nonetheless, because Murphy and Black administratively separated these two candidates into a pool for two positions, they were automatically hired.

47. Watson, on the other hand, was placed solely in the other pool with another experienced faculty member. In early May of 2014, as the retention process was well underway, a male tenure track faculty member exercised his rights to "retreat" to the marketing department and effectively fill one of these positions. Black arbitrarily chose to assign that position to the pool in which he had placed Watson, thus ensuring that she would be competing against another experienced faculty member for a single position.

48. As soon Watson learned of this change, she again requested to also be considered for positions in the other pool, for which she was clearly more qualified than the two candidates Black and Murphy had placed there. However, the search committee chair said he had no authority to consider Watson for these positions, and that Dr. Black and Dean Murphy made that determination.

49. Indeed, Black's decision to reduce the pool to which Watson was assigned to a single position was even more preposterous due to the fields these professors specialized in. Prior to his return to the department, Dr. Jackowski, the "retreating" professor's, "seat" was held by Mr. Scott Sherwood, a similarly-situated male colleague of Dr. Watson's, as the fields

of Jackowski and Sherwood had substantially similar fields of study. Mr. Sherwood was one of the less-qualified candidates in the “other pool” of positions for which Watson was not being considered.

50. Thus, instead of logically taking a position from the pool in which the male Sherwood was applying, when Black chose to take the position from Watson’s pool, Black knew he was effectively ensuring Watson’s non-renewal. Watson again complained to Morehouse that this action was discriminatory. Morehouse took no action.

51. Shortly thereafter, on approximately May 22, 2014, Watson was informed she was not being renewed as a faculty member at MSU.

52. Like Watson, when MSU informed Black that Sahami had brought forward the complaints raised with Sahami by both the student and the terminated female professor Black took aggressive action against Sahami.

53. Black filed a formal written grievance against Sahami, alleging in relevant part that Sahami had discriminated against and harassed Black, and had failed to be objective in his professional judgments of Black. In addition, Black alleged Sahami retaliated against Black, though without identifying any protected conduct. This was a ludicrous allegation, since Sahami had no relationship with Black. Each of these allegations related to Sahami having brought forward the complaint Sahami had received concerning Black’s sexual misconduct. Black wrote in his complaint, “I am left to conclude that the sole purpose of his actions was to aid in the EEOC complaint against me, and, thus, I submit this formal complaint of unprofessional behavior.”

54. Instead of summarily dismissing Black’s complaint as he was permitted to do, MSU President Jordan ordered a formal investigation of Sahami, and MSU hired an

acquaintance of MSU's General Counsel to conduct a detailed investigation into Sahami's conduct.

55. While investigating Sahami at the time, the University never actually investigated the underlying claims against Black – and, upon information and belief, even as of 2017, had not subjected Black to any discipline as a result of his behavior in any of these incidents.

56. Following the extensive investigation of Sahami's conduct, which required Sahami to retain counsel and expend significant funds to defend himself from allegations which should have been summarily dismissed by MSU as unlawful under Title VII, the investigator issued his conclusions.

57. MSU President Jordan could again have summarily dismissed the allegations against Sahami, but chose to instead assign the matter to a Campus Ethics Committee.

58. The proceedings before the Committee were repeatedly manipulated by MSU and its counsel to ensure Sahami had only a limited chance to present information and would be unable to confront or even question his accuser.

59. The Committee found the bulk of the allegations against Black to be unsubstantiated. Nonetheless, the Committee found that Sahami made improper professional judgments of Dr. Black, and recommended discipline be meted out against him. The Committee did not consider Sahami's protected rights under Title VII in making its determination that Sahami should be disciplined.

60. Throughout the process, Sahami complained to Jordan, the investigator, and the Committee that Black's complaint and the actions being taken against him were in violation of Title VII.

61. Ultimately MSU President Jordan issued Sahami a letter of reprimand as a result of Black's complaints.

62. During this process, Sahami was repeatedly forced to exert significant time, emotional and financial resources, and energy into defending himself from Black's retaliatory Complaint.

63. The actions by Black and MSU in response to Dr. Black's complaint, would have discouraged a reasonable person from engaging in activity protected under Title VII.

64. Plaintiffs have suffered substantial economic loss as a result of Defendants actions.

65. Plaintiffs have suffered emotional distress as a result of retaliation by Defendant.

**FIRST CLAIM FOR RELIEF**
**(RETALIATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000(e), *et seq.*)**

66. Plaintiffs and re-alleges all previous paragraphs of this Complaint as though fully incorporated herein.

67. Plaintiffs engaged in protected activity by repeatedly complaining to MSU about the hostile work environment and discrimination, sexual misconduct, and retaliation to which Plaintiffs and other employees had been subjected.

68. Plaintiffs' complained of activity made unlawful by Title VII, or activity that Plaintiffs reasonably believed was protected by Title VII.

69. As a direct result of their complaints of discrimination, Plaintiffs suffered adverse employment actions by Defendant during the course of their employment including, but not limited to, Watson's non-renewal.

70. Defendant knew that Plaintiffs had engaged in the above-stated protected activities. The adverse actions taken by Defendant, including actions taken by Black, were a direct result of Plaintiffs' complaints of discrimination.

71. Defendant's conduct was willful and wanton, or performed in reckless disregard for Plaintiffs' protected rights against retaliation under Title VII.

72. As a direct result of Defendant's unlawful and intentional conduct, Plaintiffs have suffered both economic and non-economic losses and injury.

73. Plaintiffs for relief from their injuries and losses as more fully set forth below and including, but not limited to, actual economic loss, compensatory damages for pain, suffering, punitive damages as may be recoverable at law, attorney fees and costs. Plaintiffs repeat and reallege all pervious paragraphs of this Complaint as though fully incorporated herein.

## SECOND CLAIM FOR RELIEF
## (By Watson)
(Sex Discrimination and Hostile Work Environment in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e) *et seq.*)

74. Plaintiffs repeat and reallege all previous paragraphs of this Complaint as though fully incorporated herein.

75. Watson is a female, and thus a member of a protected class under Title VII.

76. Watson's similarly situated male colleagues received more favorable treatment than Watson from Defendant with respect to the terms and conditions of their employment.

77. Watson was subjected to adverse employment actions, including, but not limited to, discharge, based upon her sex.

78. Defendant maintained and condoned a sexually hostile work environment that was pervasive and severe.

79. Defendant maintained a workforce and environment that discriminated on the basis of sex.

80. Plaintiff Watson was subjected to a pervasive and severe sexually hostile work environment because of her gender.

81. The sexually hostile and discriminatory work environment to which Plaintiff was subjected adversely affected the terms and conditions of her employment with Defendant.

82. Defendant's conduct in maintaining and condoning a sexually hostile work environment on the basis of Plaintiff's gender was an unlawful employment practice in violation of Title VII.

83. The effect of Defendant's unlawful employment practice has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee.

84. Defendant's unlawful employment practice was intentional.

85. Defendant's conduct was willful and wanton, or was performed in reckless disregard for Plaintiff's protected rights against discrimination under Title VII.

86. As a direct result of Defendant's unlawful and intentional conduct, Plaintiff has suffered both economic and non-economic losses and injuries. Plaintiff prays for relief from her injuries and losses as more fully set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for an Order of this Honorable Court:

1. Entering judgment in their favor against Metropolitan State University of Denver;

2. Awarding Plaintiffs actual economic damages in an amount to be determined at trial;

3. Compensating Plaintiffs for any lost wages, benefits, and lost employment opportunities, including back-pay and front-pay;

4. Awarding Plaintiffs compensatory damages including, but not limited to, those for future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish and other pecuniary losses;

5. Awarding Plaintiffs punitive damages as may be allowed by law and to be determined at trial;

6. Awarding Plaintiffs reasonable attorneys' fees and costs of this litigation;

7. Awarding Plaintiffs pre-judgment interest and post-judgment interest, as provided by law; and,

8. For such other relief as this Court deems necessary, just and proper.

PLAINTIFFS REQUEST A JURY TRIAL ON ALL ISSUES SO TRIABLE

Respectfully submitted this 8thday of March, 2017.

McNamara &Shechter LLP

BY: /s/ Mathew S. Shechter___________

Todd J. McNamara
Mathew Shechter
1640 East 18th Avenue
Denver, Colorado 80218-1202
303-333-8700 T
303-331-6967 F
tjm@18thAveLaw.com
mss@18thAveLaw.com